IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RONNIE L. McNORTON, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | CIVIL ACTION FILE NO. |
| | : | |
| GEORGIA DEPARTMENT OF | : | 1:06-CV-2097-AJB |
| TRANSPORTATION, | : | |
| | : | |
| **Defendant.** | : | |

# O R D E R   A N D   O P I N I O N [1]

Before the Court is Defendant's Motion for Summary Judgment, [Doc.13].  For

the reasons set forth below, the undersigned **GRANTS** Defendant's Motion for

Summary Judgment, [Doc. 13], as to Plaintiff's Title VII claim for retaliation.

Plaintiff's state law claim for negligent infliction of emotional distress is **DISMISSED**

**WITHOUT PREJUDICE**.

## I.    INTRODUCTION

On July 26, 2006, Plaintiff Ronnie McNorton filed a complaint in the Superior

Court of Fulton County, Georgia, alleging that his October 7, 2005, discharge from

---

[1]    The parties have consented to the exercise of jurisdiction by the
undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  [Doc. 7].
Therefore, this Order constitutes a final Order of the Court.

employment with Defendant was the result of unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). He also sought damages for negligent infliction of emotional distress under Georgia law. [Doc. 1, Exh. A]. Following service of the complaint upon it, on September 1, 2006, Defendant timely removed the action to this Court. [*See* Doc. 1].

Defendant moved for summary judgment, [Doc. 13], which Plaintiff opposed. [Doc. 17]. Defendant also has filed a reply brief. [Doc. 22]. With briefing completed, the Court turns to Defendant's motion.

## II.    PRELIMINARY MATTERS

### A.    *Plaintiff's Failure to Respond to Defendant's Undisputed Facts*

Although Plaintiff contends that genuine issues of material fact exist in this case, [Doc. 17, Att. 1] (Pl. SMF), he has not filed a proper response to Defendant's statement of material facts ("DSMF,"). [Doc. 13, Att. 2]. Defendant argues that because Plaintiff has not rebutted the statements of undisputed fact with citations to evidence in the record, these facts should be considered admitted.

N.D. Ga. R. 56.1B provides, in relevant part:

(1) A movant for summary judgment shall include with the motion and brief a separate, concise, numbered statement of the material facts to

2

which the movant contends there is no genuine issue to be tried. Each material fact must be numbered separately and supported by a citation to evidence proving such fact. The court will not consider any fact: (a) not supported by a citation to evidence (including page or paragraph number); (b) supported by a citation to a pleading rather than to evidence; (c) stated as an issue or legal conclusion; or (d) set out only in the brief and not in the movant's statement of undisputed facts.

(2) A respondent to a summary judgment motion shall include the following documents with the responsive brief:

a.      A response to the movant's statement of undisputed facts.

(1)    This response shall contain individually numbered, concise, nonargumentative responses corresponding to each of the movant's numbered undisputed material facts.

(2)    This Court will deem each of the movant's facts as admitted unless the respondent: (i) *directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number)*; (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B.(1).

b.      A statement of additional facts which the respondent contends are material and present a genuine issue for trial. Such separate statement of material facts *must meet the requirements set out in LR 56.1 B.(1).*

N.D. Ga. R. 56.1B(1), (2) (2006) (emphasis added). Thus, statements of fact

supporting and opposing summary judgment motions must cite to evidence in the

record to be considered; naked denials are insufficient. *Garland v. Advanced Med.*

*Fund, L.P., II*, 86 F. Supp. 2d 1195, 1199-1200 & n.4 (N.D. Ga. 2000) (citing

N.D. Ga. R. 56.1B(3)).

Plaintiff's "Statement of Material Facts" does not cite to evidence in the record,

as required by decisions of this Court and this Court's local rules.  In fact, his statement

does not even  include any allegedly disputed material facts.  Plaintiff's facts consist

of two paragraphs, as follows:

> Plaintiff submits that there is a material issue as to whether the Plaintiff's participation in the Defendant's investigation of the allegations of sexual harassment of Joy Taylor by a supervisor employed by the Defendant constituted opposition against discriminatory actions as contemplated by 42 U.S.C. § 2000e-3.

> Plaintiff submits that there is a material issue as to whether the actions of the Defendant in terminating the Plaintiff from his employment was related to Plaintiff's involvement in statutorily protected activity as contemplated by 42 U.S.C. § 2000e-3.

[Doc. 17, Att.1] (Pl. SMF).  Although Plaintiff includes a factual narrative in his

response brief, he does not, in any instance, cite to the record.  [*See* Doc. 17] (Pl. resp.).

The Court does not have an obligation to parse a summary judgment record to

search out facts or evidence not brought to its attention. *Atlanta Gas Light Co. v. UGI*

*Utilities, Inc.*, 463 F.3d 1201, 1209 n.11 (11th Cir. 2006).  "It is the obligation of the

AO 72A
(Rev.8/8
2)

non-moving party . . . not the Court, to scour the record in search of the evidence that would defeat a motion for summary judgment: Rule 56 'requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Lawrence v. Wal-Mart Stores, Inc.*, 236 F. Supp. 2d 1314, 1322 (M.D. Fla. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Accordingly, the Court deems any of Defendant's factual statements that are supported by the record to have been admitted for the purposes of the summary judgment motion. *See Jackson v. City of Stone Mountain*, 232 F. Supp. 2d 1337, 1341 (N.D. Ga.2002) (treating as admitted defendant's numbered facts in its statement of facts, where plaintiffs failed to comply with N.D. Ga. R. 56.1B(2) by filing a separate statement of material facts in which they respond to each of the movant's numbered facts and thus, failed to controvert any of defendant's material facts).

B.      *Effect of Plaintiff's Failure*

In situations where a plaintiff has not adequately responded to a motion for summary judgment, the Eleventh Circuit has instructed district courts to review the motion and supporting documents to determine whether genuine issues of material fact exist. *See Trs. of the Cent. Pension Fund of the Int'l Union of Operating Eng'rs and*

5

*Participating Employers v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1039-40 (11ᵗʰ Cir. 2004); *United States v. One Piece of Prop., 5800 S.W. 4th Ave., Miami, Fla.*, 363 F.3d 1099, 1101-02 (11ᵗʰ Cir. 2004).

Therefore, despite Plaintiff's failure to properly respond to Defendant's Statement of Undisputed Material Facts, the Court must still determine if additional relevant facts in the record reveal a genuine issue of material fact. *See Jackson*, 232 F. Supp. 2d at 1341-42.

## III.    STATEMENT OF MATERIAL FACTS

The pertinent facts of this case at the summary judgment stage, construed in the light most favorable to Plaintiff as the non-moving party,[2] are as follows:

Plaintiff was employed by the Georgia Department of Transportation ("GDOT") in 1989 as a Temporary Maintenance Worker.  He became a permanent employee in 1990, and was eventually promoted to Equipment Operator III.  (D ¶ 1; Deposition of Ronnie McNorton ("Pl. Dep.") at 33-38).  In 1996, Plaintiff began training for the

---

[2]    In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11ᵗʰ Cir. 2004) (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11ᵗʰ Cir. 1999)).

AO 72A
(Rev.8/8
2)

Highway Emergency Response Operations ("HERO") Unit and became a HERO Operator I in 1997. *Id.*

At the time of his dismissal by Defendant in October 2005, Plaintiff held the position of HERO Operator II on the ALPHA shift (5:00 a.m. - 1:30 p.m.).[3] Plaintiff's immediate supervisor at that time was Shift Supervisor Daniel Hester. Clint Brooks was the Assistant Incident Management Manager, and Gary Millsaps was the Incident Management Manager. Millsaps was responsible for the daily operations of the HERO unit. (D ¶ 2). As a HERO Operator, Plaintiff was responsible for patrolling an assigned route, assisting stranded motorists, responding to traffic incidents, and determining a plan of action for removing the incident. (D ¶ 3).

The GDOT Performance Management Form ("PMF") sets forth the performance requirements for HERO operators. The form designates "Teamwork" as an "applicable and critical" skill. HERO Operators are to "[e]ncourage and facilitate cooperation, pride, trust, and group identity; foster commitment and team spirit; [and] work cooperatively with others to achieve goals." (D ¶ 4), [Doc. 13, Att 6, Exh 3:B at 5]. "Organizational Commitment" is also considered an "applicable and critical" skill and

───────────────

[3]        Plaintiff also worked in other positions during the course of his career at the GDOT, including Assistant Incident Management Engineer in 2002. [*See* Doc. 16, Att. 6, Exh. 3-D].

7

HERO Operator are required to "[d]isplay[] a high level of effort and commitment to performing work; operate[] effectively within the organizational structure; [and] demonstrate trustworthiness and responsible behavior. (*Id*.). HERO operators must read, learn and follow all GDOT online policies and procedures. (D ¶ 5). The GDOT also requires that HERO Operators appropriately use leave time in order to ensure effective and efficient coverage of all shifts. (D ¶ 6).

During Plaintiff's sixteen years of employment with the GDOT, he received discipline on several occasions for various types of misconduct from absenteeism to insubordination. For example, on May 1, 2001, Brooks issued Plaintiff a verbal warning for failure to follow proper procedures for calling in a late arrival. [Doc. 13, Att. 6, Exh. 3] (Affidavit of Gary Michael Millsaps ("Millsaps Aff.") ¶ 7 & Exh. C).

Plaintiff received further discipline in connection with a new GDOT hire, Joy Taylor. In May 2002, Taylor interviewed for the position of HERO trainee. (Millsaps Aff. ¶ 10). In June 2002, she was hired for the position. (*Id*. ¶ 11.) Plaintiff participated in the interview process and Defendant hired Taylor, in part based on Plaintiff's recommendation. (*Id.*). Millsaps testified that prior to hiring Taylor, he had heard rumors that Plaintiff and Taylor were involved in a personal relationship. When

8

Millsaps asked Plaintiff about his relationship with Taylor, however, Plaintiff claimed that he knew Taylor because she was a tow truck driver.  (*Id.* ¶10).

Millsaps testified that after Taylor was hired, he continued to hear that Taylor and Plaintiff were "a couple." (Millsaps Aff. ¶ 12).  Plaintiff again denied any personal relationship with Taylor, but now claimed that he knew her because he fished with Taylor's husband.  (*Id.* ¶ 11).  Millsaps testified that "it became apparent that there was an on-going relationship" between Plaintiff and Taylor, since Taylor, who was pregnant, had claimed that Plaintiff was the father of her child.  Millsaps and Carla Holmes, the State Traffic Operations Engineer, questioned Plaintiff a third time about his relationship with Taylor and warned him that a personal relationship could constitute a conflict of interest.  Millsaps testified that this time Plaintiff told him that he and Taylor were neighbors and "baby-sat each other's children."  (*Id.* ¶¶ 13, 14).  Plaintiff initially denied being the father of Taylor's child but eventually admitted to having had sex with Taylor on one occasion, about one month prior to her interview.  (*Id.* ¶ 14), (Pl. Dep. at 61).

Plaintiff testified that he did not admit to having a relationship with Taylor because he did not consider himself to be "involved" with someone with whom he had only a one-night stand.  *See* Pl. Dep. at 55, 61.  He stated that never told anyone during

the interview process that he and Taylor had been sexually intimate because he considered such information "personal business" and it did not occur on GDOT time. (*Id.* at 56-58).  Plaintiff denies giving Taylor any special treatment during the interview process.  (*Id.* at 58).

On July 1, 2002, Plaintiff was issued a notice of proposed adverse action "for misconduct and conflict of interest" regarding his handling of the Taylor situation.  The notice stated, in pertinent part:

> During the week of May 13, 2002, you participated in the interview of a female applicant for the position of HERO Trainee.  After the interviews were conducted and before the selection package was submitted, it was brought to the attention of Gary Millsaps, Incident Management Manager, that you have a personal relationship with this candidate.  When questioned by Mr. Millsaps you denied any type of bias or relationship except for knowing her husband.  This candidate was hired based on a recommendation from you as a participant in the interview.  After the candidate was hired you were seen having lunch with her in your office were again questioned by Mr. Millsaps concerning your relationship with the individual and cautioned that such a relationship could be a conflict of interest.  Again, you emphatically any type of involvement.  As other contradictory evidence arose you were then questioned by Mrs. Carla Holmes, P.E., Assistant State Traffic Engineer, and Mr. Millsaps.  When first questioned you again emphatically denied any type of relationship with the employee.  It was not until confronted with the evidence that you admitted to having a prior intimate relationship with her.
>
> On three different occasions you were questioned by your supervisor, and on all three occasions you tried to deceive your supervisor about a conflict of interest and your personal relationship with the employee.  This is

10

> misconduct and cannot be tolerated especially in a management position. In such a situation you should have refused to participate in the interview. No matter the size roll you may have played in the interview you should have notified Mr. Millsaps of your involvement with the candidate or excused yourself from the interview. The position of Assistant Incident Management Manager requires a high level of trust and honesty. Both subordinates and superiors require this type of integrity. Your actions have shown no regard for this requirement.

(Millsaps Aff. Exh. D).

The notice further advised Plaintiff that he would be demoted from Assistant Incident Management Manager to HERO Operator with a 10% salary reduction. (*Id.*). Plaintiff appealed this action and the parties subsequently entered into a settlement agreement, in which Plaintiff received a demotion with 5% salary reduction. (D ¶ 14). Plaintiff and Taylor subsequently moved in together sometime in the summer or fall of 2002 and continued to live together until January 2007. (D ¶ 15), (Pl. Dep. 59).

On March 4, 2003, Millsaps placed Plaintiff on a six month leave restriction due to excessive absenteeism. From November 1, 2002 through March 4, 2003, Plaintiff had taken leave totaling 40 days. (D ¶ 17). Millsaps directed Plaintiff to request all annual leave two weeks in advance and to obtain a physician's statement for any sick leave taken. Millsaps warned that failure to abide by these instructions could subject Plaintiff to disciplinary action, "up to and including dismissal." (Millsaps Aff. Exh. E).

11

On March 7, 2003, Millsaps placed Plaintiff on leave without pay status for failure to report to work as scheduled on that day.  (D ¶ 17).

On February 25, 2004, Millsaps authorized Scott Simonton, Plaintiff's immediate supervisor at the time, to place Plaintiff on leave without pay for February 18 through February 24, 2004, after Plaintiff failed to notify anyone that he was going to be absent from February 18 through February 22.  In the written memorandum, Simonton warned Plaintiff that failure to notify a supervisor violated the standard operating procedure and GDOT policy.  (Milsapp Aff. Exh. G).  Plaintiff testified that Simonton told him that he did not need to call when he was going to be out of work and claimed that Simonton only wrote him up because Millsaps told him to do so.  (Pl. Dep. at 112-13).

Millsaps testified that, on February 26, 2004, due to persistent absenteeism, Plaintiff was involuntarily moved from the ALPHA shift (5:30-1:30 p.m.) to the later BRAVO shift (1:00 p.m. to 9:30 p.m.).  (D ¶ 19).  Plaintiff disputes Defendant's characterization of the transfer as involuntary.  He testified that at that time he was "having problems with people trying to break into my house and my daughter was out very sick," (Pl. Dep. at 92), and that Simonton approached him about speaking to John Kirkpatrick, the Employee Management Relations Specialist, [*see* Doc. 13 , Att. 8,

AO 72A
(Rev.8/8
2)

Exh. 5] (Affidavit of John Kirkpatrick ("Kirkpatrick Aff.")), regarding Plaintiff's absenteeism. Plaintiff testified that Kirkpatrick told him "it'd be in both of ours best interest[s] if [he] went to the evening shift where [he] wouldn't have to get up as early." (Pl. Dep. at 92).

Millsaps testified that on March 1, 2004, he recommended to Carla Holmes, Transportation Engineering Administrator, that Plaintiff be reprimanded for excessive absenteeism. Millsaps stated that despite being placed on leave restriction for six months beginning in March 2003 and receiving a performance management evaluation in June 2003, providing that Plaintiff needed to improve in the area of appropriate use of leave, Plaintiff took nineteen (19) days of leave from September 4, 2003, through March 1, 2004, and had been placed on four days of authorized leave in February 2003. (D ¶ 20). Holmes issued Plaintiff a letter of reprimand reciting the facts as stated by Millsaps and warning that "[c]ontinued chronic absenteeism will result in further disciplinary action up to and including dismissal." (Millsaps Aff. Exh. H).

In March 2005, Plaintiff obtained Field Training Officer ("FTO") status, which warrants additional pay. (D ¶ 21). HERO Operators with FTO status assist the shift supervisor in day-to-day operations including vehicle inspection, paperwork, and in-class and on-the-road HERO Operator training. (D ¶ 21). Millsaps testified that to

13

maintain FTO status, an employee must "display a positive attitude and exhibit teamwork and organizational commitment." (Millsaps Aff. ¶ 22).

In May 2005, Plaintiff applied for the position of HERO supervisor for the BRAVO shift. (D ¶ 22). On June 1, 2005, Defendant promoted Roosevelt Smith to the position. (D ¶ 23).

Millsaps testified that on the evening of June 28, 2005, Brooks informed him that Smith and two other HERO Operators, Al Westbrook and Robert Simms, separately contacted him to complain that Plaintiff and HERO Operator Jeff Brewer were "attempting to obtain information to discredit Smith." (Millsaps Aff. ¶ 25). Westbrook and Sims complained that Plaintiff and Brewer were questioning co-workers as to whether they had even seen Smith sleeping on the job, mistreat an employee, perform his job inadequately or make rude comments. (*Id*.). Millsaps instructed Brooks to obtain written statements from both Westbrook and Sims. An employee named Raymond Vargas also submitted a statement. (*Id*.).

On June 29, 2005, Smith filed a written complaint against Plaintiff and Brewer. (D ¶ 26). [Doc. 13, Att. 8, Exh. 4] (Affidavit of Junius Clint Brooks ("Brooks" Aff.) ¶ 8)). On the same day, Brooks and Millsaps interviewed Plaintiff, Brewer and Taylor about Smith's allegations. (Millsaps Aff. ¶ 28). Millsaps testified that based on these

14

interviews and the written statements, he and Brooks determined that Plaintiff had failed to conduct himself according to FTO requirements. Millsaps testified that Plaintiff's "attempt to discredit Mr. Smith by soliciting complaints from co-workers regarding Mr. Smith's honesty and his ability to perform as a supervisor exhibited that [Plaintiff] lacked the team work, positive attitude, and organizational commitment necessary to maintain FTO status." (Millsaps Aff. ¶ 29).

Brooks issued Plaintiff a written notice of removal of FTO status on June 29, 2005, which provides, in part:

> This action is based on your failure to meet the **Recommended Criteria** in the area of **Performance** (self mgmt, team work, and decision making) and Interpersonal Skills (integrity/honesty, displaying a positive attitude, desire to be part of the solution and not complain about the problem). . .
>
> Your inability to accept not having been selected for the position of Shift Supervisor and your unwillingness to function under the authority of the person newly selected has continuously caused dissension within your assigned shift and ultimately within the Unit as a whole. As such, effective July 5, 2005, you are being reassigned to the Alpha Shift (05:00AM - 13:30[4] PM) and will report directly to Daniel Hester, Hwy Emergency Shift Supervisor.
>
> I can't stress to you enough the need for you to make an immediate (positive) change in your behavior.

---

[4]      "13:30" appears to be a typographical error, as Millsaps's affidavit states that Plaintiff was reassigned to the 5:00 a.m. - 1:30 p.m shift. *See* Millsaps Aff. ¶28.

AO 72A
(Rev.8/8
2)

(Millsaps Aff. Exh. I).

Plaintiff denies that he attempted to "discredit" Smith. Plaintiff testified that Brewer "butted in[to]" a conversation between Plaintiff and another employee and started talking about Smith. (Pl. Dep. at 121). Plaintiff contends that Brewer asked him if Smith was "still playing cards out there at night up under the bridge . . . is he still leaving the job going home at night and then coming back to work with the HERO vehicle?" (Pl. Dep. at 120). Plaintiff claims that he "walked off" because he did not want to listen to Brewer. (*Id.*) Although Plaintiff denies speaking about Smith, he testified, however, that Brewer's statements about Smith were true and that he had only "repeated what this guy sitting next to me had just told me the day before about [Smith] playing cards and going home." (Id. at 122-23). Plaintiff contends that he was not "the bad apple" in this case because "[a]ll the employees [were] talking negative." (*Id.*).

On August 19, 2005, Millsaps authorized Hester to issue Plaintiff a warning letter because of his frequent absences. (Millsaps Aff. ¶ 29). The letter stated that from July 1, 2005, until August 19, 2005, Plaintiff had been absent 13 of 36 work days and had been on sick leave for three days without a doctor's excuse. (*Id.* Exh. J).

Plaintiff testified that on September 19, 2005, he witnessed Smith sexually harass Taylor. Plaintiff testified Taylor was lying on a backboard during a safety exercise in

16

which she played the role of accident victim when Smith commented that "I'm going to get her this time, I'm not going to be able to touch her again like this in front of [Plaintiff]." (Pl. Dep. at 191). Smith then allegedly "rubb[ed]" his hand on Taylor's backside. (*Id.*). Plaintiff recalls Taylor saying to Smith "that's going far enough." (*Id.*). Smith then "[took] his hand and he slid it back down the other side." (*Id.*). Plaintiff did not discuss the incident with Taylor or report it to anyone himself. (*Id.* at 187). Plaintiff testified that when the incident occurred, he "laughed with the rest of them." (*Id.* at 183).

On Monday, September 26, 2005, both Millsaps and Brooks received a written complaint via email from Smith stating that on September 23, 2005, Plaintiff had removed a Traffic Incident Management Handbook from Smith's office without permission. (Brooks Aff. ¶ 11), (Millsaps ¶ 31). The email stated:

> This letter will serve as my written complaint about the conduct of Ronnie McNorton on Friday 09-23-05 in my office. Ronnie NcNorton enter [sic] my office and removed from my desk without permission a Traffic Incident Management Handbook. Not only did he pick the handbook up off the desk and beg[i]n to read it, he then took the handbook from my office with the intent to steal it. I confronted Ronnie McNorton as to the whereabouts of the handbook in the office of David Casteel Charlie Supervisor. Present also in that office was Daniel Hester Alpha Supervisor. When I asked Ronnie McNorton what he had done with the handbook? [sic] He stated that he had given it to Joy Taylor to read. I then went to Joy Taylor and ask [sic] for the handbook back, Joy Taylor

17

told me she didn't have the handbook nor did she know what handbook I was talking about, that Ronnie had never given her a handbook.  I again confronted Ronnie McNorton about the handbook and he continued to say Joy Taylor had it.  I told Ronnie McNorton that Joy didn't have the handbook and he continued to say Joy Taylor had it.  I told Ronnie McNorton that Joy didn't have the handbook nor did she know anything about the handbook.  Ronnie McNorton then went back into the Charlie Shift Supervisor Office and came back out and now said that David Casteel had the handbook.  I then asked David Casteel where he got the handbook.  He stated to me that Ronnie McNorton took the handbook out of his black bag and just gave it to him.

I feel that Ronnie McNorton not only was Dishonest to me about the whereabouts of the handbook, but that he intended to steal the handbook which is a violation of Ga. Law, and violation of GDOT CODE OF ETHICS.

(Brooks Aff. Exh. B).  Hester requested that Plaintiff submit a written version of his version of events.  [Doc. 13, Att. 5, Exh. 2] (Affidavit of Daniel Hester ("Hester Aff.") ¶ 7; Exh. B).[5]

Millsaps testified that on September 26, 2005, he instructed Brooks to contact Kirkpatrick, the Employer Relations Specialist, for advice.  (Millsaps Aff. ¶ 31).  Brooks contacted Kirkpatrick on September 27, 2005, about Smith's complaint.  (Brooks Aff. ¶ 12).  He forwarded Smith's complaint to Kirkpatrick, who instructed

_____

[5]     Plaintiff claims that the written statement of events in the record is not his handwriting and is not the document he submitted, but that the events recounted are not incorrect.  His statement allegedly contained greater detail.  (Pl. Dep. 170-73).

18

Brooks to wait until he contacted him again before taking any action.   (Brooks Aff. ¶¶ 13, 14), (Kirkpatrick Aff. ¶¶ 4, 5).

Kirkpatrick testified that earlier the morning of September 27, 2005, Taylor filed an internal complaint alleging that Smith had sexually harassed her on September 19, 2005, during a medical first responder refresher training class.  (*Id.* at ¶ 6).

Also on September 27, 2005, Plaintiff submitted a written statement of his version of events regarding Smith's allegations of the stolen book.  Plaintiff claimed that he had borrowed the manual to read it and put the manual in his bag.  He stated that he gave it to Casteel when he finished reading the material to return to Smith. (Hester Aff. ¶ 7,  Exh. A).

Millsaps testified that on September 28, 2005, he learned that the day before Taylor had filed an internal complaint regarding Smith's alleged sexual harassment. Holmes, the State Traffic Operations Engineer, placed Smith on administrative leave with pay pending investigation of Taylor's claims.  (D ¶¶ 34, 35).

Kirkpatrick interviewed Plaintiff about Taylor's allegations on September 29, 2007.  (Pl. Dep. at 188).  Plaintiff testified that he did not know why Kirkpatrick wanted to speak with him until he arrived but that he suspected it might be about the manual incident with Smith.  (*Id.* at 189).

19

On October 3, 2005, Millsaps requested that Casteel submit a written statement regarding Smith's allegations that Plaintiff attempted to steal the manual.  (D ¶ 37). Casteel stated Smith had entered his office "irritated because a booklet had disappeared off his desk."  Smith told Casteel that he "had questioned Ronnie McNorton and was told that Joy Taylor had the booklet . . . Mr. Smith stated he questioned Joy Taylor and she did not know what he was talking about."  Casteel claimed that "[w]ithin a few minutes Ronnie McNorton came into my office . . pulled a book from his bag and handed it to me [and asked] if I would mind giving the book to [Smith]. . . ."  (Millsaps Aff. Exh. M).

Roy Monroe and Daniel Hester also submitted written statements to Millsaps regarding Smith's allegations.  Monroe stated that he had been present when Smith asked Taylor for the book and she claimed not to have it.  Monroe also claimed that he heard Plaintiff say that Casteel had the manual. (Millsaps Aff. Exh. O).  Hester stated that he had been sitting in Casteel's office with Plaintiff when Smith entered and asked Plaintiff for the manual.  Hester stated that Plaintiff told Smith that Taylor had the book.  After a few minutes, Smith returned claiming that Taylor denied having the manual but that Casteel had returned the book to him.  Hester stated when he asked

20

Plaintiff for his version of events, Plaintiff told him that he had mistakenly left the book in his bag.  (Millsaps Aff. Exh. N).

Plaintiff testified that Smith gave him permission to take the manual and read it in the break room.  (Pl. Dep. at 134).  He claims that he left the manual with Taylor but that when he asked her about it, she claimed not to know what he was talking about. (*Id.* at 158-60).  He testified that he then went back into Casteel's office, where he had left his bag, and when he looked inside the bag, found the missing book.  He gave the manual to Casteel and asked him to return it to Smith.  (*Id.* at 160).  Plaintiff claimed that Taylor had put the manual back into his bag.  (*Id.* at 163).  Plaintiff testified that Smith lied about the events surrounding the manual "like he's trying to get back at me for something."  (*Id.* at 162).

Millsaps received these written statements on October 4, 2005.  Millsaps testified that due to Plaintiff's "repeated violations of departmental leave policies, his inability to work with a shift supervisor, his lack of teamwork and organizational commitment; and his misconduct displayed on September 23, 2005," he recommended Plaintiff's termination.  (Millsaps Aff. ¶ 38).

On October 7, Holmes sent a separation notice to Plaintiff reciting the reasons set forth by Millsaps as the basis for his termination.  (*Id.* Exh. P).

AO 72A
(Rev.8/8
2)

On November 2, 2005, Plaintiff filed a charge before the Georgia Commission on Equal Opportunity ("GCEO") alleging retaliation.  (D ¶ 41).

## IV.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The movant carries the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact."  *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex*, 477 U.S. at 323).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324.  "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The Court's function is not to weigh

22

the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Id.* at 248. "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* If the record does not blatantly contradict the nonmovant's version of events, the Court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *See Anderson*, 477 U.S. at 252; *see also EPL Inc. v. USA Federal Credit Union*, 173 F.3d 1356, 1362 (11th Cir. 1999); *Duke v. Cleland*, 884 F. Supp. 511, 514 (N.D. Ga. 1995).

## V.    DISCUSSION

### A.    *Title VII Retaliation*

Under the anti-retaliation clause of Title VII of the Civil Rights Act of 1964, it is an unlawful employment practice for an employer to discriminate against an employee "[(1)] because he has opposed any practice made an unlawful employment practice by this subchapter, or [(2)] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this

23

subchapter." 42 U.S.C. § 2000e-3(a). These two prohibitions on retaliation are generally known as the opposition clause and the participation clause, respectively. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).

A plaintiff may prove a case of Title VII retaliation by either direct or circumstantial evidence. *Masso v. Miami-Dade County*, 465 F. Supp. 2d 1260, 1264 (S.D. Fla. 2006) (citing *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999)). Where, as in this case,[6] a plaintiff does not contend that he has direct evidence of discriminatory intent and the retaliation claim is supported only by circumstantial evidence, the Court analyzes the claim using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). *Adams v. Cobb County School Dist.*, 242 Fed. Appx. 616, 620 (11th Cir. 2007); *see also Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 511 n.10 (11th Cir. 2000) (*McDonnell Douglas* burden-shifting framework applies to retaliation claims as well); *McDaniel v. Fulton County Sch. Dist.*, 233 F. Supp. 2d 1364, 1384 (N.D. Ga. 2002).

---

[6]     Plaintiff does not explicitly state that he is relying on circumstantial evidence but his brief addresses only the circumstantial *prima facie* case.

AO 72A
(Rev.8/8
2)

Under Title VII's analytical framework, where a plaintiff relies on circumstantial evidence, the plaintiff first must establish a *prima facie* case of retaliation.  *See Cooper v. Southern Co.*, 390 F.3d 695, 724-25 (11th Cir. 2004).   A plaintiff demonstrates a *prima facie* case of retaliation by showing that (1) he engaged in statutorily protected expression; (2) his employer took a materially adverse action against him;[7] and (3) some causal relationship existed between the two events.  *See Holifield*, 115 F.3d at 1566; *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. __, __, 126 S. Ct. 2405, 2414 (2006).  The defendant then must rebut the plaintiff's *prima facie* case by producing a legitimate, nondiscriminatory reason for its action.  *Cooper*, 390 F.3d at 725.  This burden is "exceedingly light."  *Holifield*, 115 F.3d at 1564.  If the defendant articulates such a reason, the burden returns to the plaintiff to establish the reason

---

[7]     This element for a *prima facie* retaliation case generally has been referred to as the adverse employment action element.  *See, e.g.*, *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).  The Court concludes that in light of the Supreme Court's *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. ___, 126 S. Ct. 2405 (2006), decision, it is more appropriate to refer to the "adverse employment action" element as the "materially adverse action" element.  The *Burlington Northern* decision explicitly states that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."  *Burlington Northern*, 548 U.S. at __, 126 S. Ct. at 2414.  The Court's decision merely requires the employee to show that a reasonable employee would have found the challenged action materially adverse, meaning the reasonable worker would be dissuaded from making or supporting a charge of discrimination.  *Id.*, 548 U.S. at __, 126 S. Ct. at 2415.

25

offered by the defendant is pretext. *Id.* Despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

In this case, Defendant does not contest that Plaintiff's termination constituted a "materially adverse action." [*See generally* Doc. 13 at 6 & n.1]. It contends, however, that it is entitled to summary judgment because Plaintiff did not engage in statutorily protected activity nor that there was any causal connection between his discharge and any protected activity.

B.   *Analysis*

1.   *Plaintiff's Prima Facie Case*

Defendant first argues that Plaintiff cannot establish that he engaged in statutorily protected activity under Title VII's participation clause because he filed his GCEO charge until after the date he was terminated. (Def. Br. at 5-8). Defendant also contends that Plaintiff does not allege a violation under the opposition clause because he did not voice opposition to any alleged unlawful employment practice at any time prior to his termination.

26

Plaintiff concedes that he did not engage in protected activity under the participation clause.[8]  Plaintiff argues, however, that his "[providing] testimony to the investigator for the Defendant that corroborated the allegations of Ms. Taylor," (Pl. Br. at 6), qualifies as protected activity under the opposition clause.  He contends that there is a material fact question as to whether his participation in the investigation of Taylor's claims constitute opposition under Title VII's retaliation clause.

a.    *Did Plaintiff engage in protected activity
under the opposition clause?*

"A plaintiff engages in 'statutorily protected activity' when he protests an employer's conduct which is actually lawful, so long as he demonstrates 'a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). This test utilizes both a subjective and an objective component.  *Amos v. Tyson Foods, Inc.*, 153 Fed. Appx. 634, 647 (11th Cir. 2005); *Little*, 103 F.3d at 960.  A plaintiff must

---

[8]    The participation clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC."  *Total Sys. Serv., Inc.*, 221 F.3d at 1174. Plaintiff's participation in Defendant's in-house investigation into Taylor's allegations, therefore, would not constitute protected activity under the participation clause.

AO 72A
(Rev.8/8
2)

demonstrate both "that []he subjectively believed [his] employer was engaged in unlawful employment practices" *and* "that this subjective belief was objectively reasonable in light of the facts and record presented." *Sherk v. Adesa Atlanta, LLC,* 432 F. Supp. 2d 1358, 1369 (N.D. Ga. 2006) (citing *Harper,* 139 F.3d at 1388). "[I]t is insufficient for a plaintiff 'to allege his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.'" *Harper*, 139 F.3d at 1388 (quoting *Little*, 103 F.3d at 960).

            i.      *Subjective belief that Defendant engaged in an unlawful employment practice*

        Defendant first argues that Plaintiff did not have a subjective, reasonable belief that Smith had engaged in an unlawful employment practice at any time prior to his termination. Defendant argues that Plaintiff repeatedly stated in sworn testimony that he did not view Smith's conduct as sexual harassment. Defendant contends that the fact that Plaintiff never complained to anyone that he witnessed sexual harassment further demonstrates that he did not subjectively believe that Defendant engaged in unlawful employment practices. Defendant argues that if Plaintiff, in fact, did perceive Smith's

28

conduct as sexual harassment, it was only as a convenient "afterthought." (Def. reply at 5).

Plaintiff responds that he subjectively believed that Smith engaged in an unlawful employment practice.  He argues that "it cannot be denied that Plaintiff testified that he was shocked when he observed what Mr. Smith had done to Ms. Taylor.  He did laugh along with everyone else; however . . . [o]nce the Plaintiff saw the change in how Ms. Taylor was acting, he realized that it was no laughing matter." (Pl. Br. at 6).

The record does not support Plaintiff's contention that he subjectively believed that Smith sexually harassed Taylor.  Plaintiff's own testimony indicates that he did not subjectively believe that Smith's conduct was sexual harassment.  Plaintiff testified as follows:

> Q:   . . . And did you, in your own mind, determine that there was sexual harassment?
>
> A:   No, ma'am.  I laughed with the rest of them.
>
> Q:   Okay.  So it didn't rise to that level, in your own mind, of sexual harassment.  Is that correct?
>
> A:   It did when Joy made her comment, and I looked at him and laughing and stuff.  *Then - - it didn't come on as sexual*

29

> *harassment.*  I was like damn, he touched her butt like that,
> I can't believe that.

(Pl. Dep. 182-83) (emphasis added).  Thus, even after Taylor told Smith "that's going far enough," (Pl. Dep. at 191), the "comment" referred to in the above excerpt, Plaintiff still did not subjectively view Smith's actions were sexual harassment.

Moreover, unlike the participation clause, which provides "broad" protection for any individual who "ma[kes] a charge, testifie[s], assist[s], or participate[s] in any manner" in an investigation or proceeding , "[t]he opposition clause by its very nature focuses upon the motive of the employee, covering only one who 'has opposed' any practice which violates Title VII." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1187 (11th Cir. 1997) (distinguishing the opposition clause from the participation clause, which "is not so limited").  In interpreting the statutory phrase "has opposed," the undersigned must assume that Congress used these words as they are commonly and ordinarily understood.  *See e.g., Federal Reserve Bank of Atlanta v. Thomas*, 220 F.3d 1235, 1239 (11th Cir. 2000).  The plain meaning of the statute controls unless the language is ambiguous or leads to absurd results.  *See e.g., Moore v. Am. Fed'n of Television and Radio Actors*, 216 F.3d 1236, 1244 (11th Cir. 2000).

30

"Oppose" means to "offer resistance to." *Merriam-Webster's Collegiate Dictionary* 816 (10th ed. 1999); *see also The New Oxford American Dictionary* 1201 (2001) ("disapprove of and attempt to prevent, esp. by argument"); *The American College Dictionary* 850 (1970) (1. to act or contend in opposition to; drive against; resist; combat.  2. to stand in the way of; hinder.  3. to set as an opponent or adversary. 4. be hostile or adverse to, as in opinion.  5. to set as an obstacle or hindrance; *to oppose reason to force*.  6. to set against in some relation, as of offsetting antithesis, or contrast; *to oppose the advantages to the disadvantages*.  7. to use or take as being opposite or contrary: *words opposed in meaning*.  8. to set (something) over against something else in place, or so as to face or be opposite.  9. to be or act in opposition.) (emphasis in original).

According to his own testimony, Plaintiff did not "oppose" Smith's actions when he spoke with Kirkpatrick.  Indeed, Plaintiff appears to have done no more than provide factual details concerning the incident between Smith and Taylor.  Plaintiff testified that, "I spoke with an investigator and explained to him what I saw,"  (Pl. Aff.), and that "I explained everything I witnessed and saw and who was all standing around laughing and giggling."  (Pl . Dep. at 190).   Plaintiff does not contend that he complained about Smith's treatment of Taylor, that he asserted any negative opinion,

AO 72A
(Rev.8/8
2)

or otherwise, implicitly or explicitly, communicated to Kirkpatrick that he believed that Smith's conduct was unlawful sexual harassment.

Regardless of Plaintiff's current subjective beliefs, construing Plaintiff's conduct at the time Kirkpatrick interviewed him regarding Taylor's allegations as "opposing" an employment practice, in any sense of the word, would require this Court to ignore the plain meaning of the statute. *See Merritt*, 120 F.3d at 1185 ("Merritt obviously can find no refuge under the opposition clause, because he did not oppose in any sense of the word the sexual harassment Moore suffered."); *Herrejon v. Appetizers And, Inc.*, No. 97-C-5149, 1998 WL 299490, at *5 (N.D. Ill. May 29, 1998) (finding that plaintiff did not engage in protected activity when plaintiff investigated sexual harassment incident as part of job duties but did not "manifest any disagreement with [defendant's] response to the incident"); *Garcia-Paz v. Swift Textiles, Inc.*, 873 F.Supp. 547, 560 (D. Kan. 1995) ("The relevant question . . . is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acted in an unlawful discriminatory manner."); *Cf. McKenzie v. Renberg's, Inc.*, 94 F.3d 1478, 1486-87 & n.8 (10th Cir. 1996)(finding that the plaintiff did not engage in protected activity under the Fair Labor Standards Act where, as part of her job duties,

32

she merely alerted the company to possible labor law violations; an "essential ingredient" of an FLSA retaliation claim is the taking of a "position adverse to [the] employer").

Moreover, Defendant is correct that the record contains no evidence that Plaintiff independently was motivated to discuss Smith's conduct toward Taylor. When summonsed to Kirkpatrick's office, Plaintiff assumed he was going to be asked about the manual incident between himself and Smith. *See* Pl. Dep. at 189-90. The fact that Plaintiff did not voice any disagreement or opposition to Smith's conduct during the Kirkpatrick interview further supports the conclusion that he still did not view Smith's conduct as sexual harassment. *See Amos v. Tyson Foods, Inc.*, 153 Fed. Appx. 637 (11th Cir. 2005) (a report from plaintiffs that a male employee, who walked through the women's restroom "in no hurry" and "gawk[ed]" at them, and "did not know his job" did not demonstrate that they held a subjective belief that he had sexually harassed them).

The Court, therefore, finds that Plaintiff cannot establish a *prima facie* case of retaliation under Title VII because he has failed to show that subjectively believed that Smith sexually harassed Taylor.

33

ii.     Objective      reasonableness      of
         Plaintiff's subjective belief

Even if Plaintiff had a subjective belief that Smith's conduct towards Taylor was sexual harassment (or there existed a genuine material fact question as to his subjective belief), the Court further finds that a reasonable person would not have believed that Smith's conduct constituted sexual harassment.

A plaintiff must not only have an honest subjective belief that the employer engaged in unlawful activity, the record "must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Harper*, 139 F.3d at1388 (quoting *Little*, 103 F.3d at 960).  "[T]he conduct opposed [need not] actually be sexual harassment, but it must be close enough to support an objectively reasonable belief that it is." *Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1351 (11th Cir. 1999).  Although claims brought under the opposition clause "are viewed in the context of the ordinary business environment," *Total Sys. Servs, Inc.,* 221 F.3d at 1176, the objective reasonableness of plaintiff's belief is "measured against existing substantive law." *Clover*, 176 F.3d at1351; s*ee also Harper*, 139 F.3d at 1388 n. 2 (failure to charge the employee who opposes an employment practice with substantive knowledge of the law

34

"would eviscerate the objective component of our reasonableness inquiry"); *Bythewood v. Unisource Worldwide, Inc*., 413 F. Supp. 2d 1367, 1374 (N.D. Ga. 2006) (same).

A plaintiff asserting a harassment claim must show that (1) she is a member of a protected class; (2) she has been subject to unwelcome harassment; (3) the harassment was based on her membership in the protected class; (4) the harassment was sufficiently severe or pervasive such that it altered the terms and conditions of her employment and created a discriminatorily abusive working environment; and (5) there is a basis for holding her employer liable.  *Johnson*, 234 F.3d at 508 (outlining elements of sexual harassment claim); *Mendoza v. Borden*, 195 F.3d 1238,1246 (11th Cir. 1998). "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Mendoza*, 195 F.3d at 1245 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Moreover, it is fairly well established that a single instance of touching an employee's buttock, such as the case here, is not serious enough to support a claim for sexual harassment. *See e.g., Hockman v. Westward Commc'ns, LLC,* 407 F.3d 317, 327  (5th Cir. 2004) (one instance of grabbing or brushing plaintiff's breasts and buttocks, slapping plaintiff on buttocks with newspaper, trying to kiss her, and commenting on another employee's body over one and a half year period not severe conduct); *Meriwether v. Caraustar*

*Packaging Co.*, 326 F.3d 990, 992, 993 (8th Cir. 2003) (grabbing plaintiff's buttock "with force" not actionable); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) (four isolated instances in which a co-worker touched the plaintiff's arm, fingers or buttocks not actionable); *see also Otu v. Papa John's USA, Inc.*, 400 F. Supp. 2d 1315, 1327-28 (N.D. Ga. 2005) (attempting to hug and kiss plaintiff, brushing her breasts against plaintiff's back, attempting to "rub his private parts," unbuttoning her blouse not severe or pervasive); *Evans v. Mobile Infirmary Med. Ctr.*, No. Civ.A. 04-0364-BH-C, 2005 WL 1840235, at * 9 (S.D. Ala. 2005) (comments about plaintiff's breasts, grabbing her buttocks on two occasions, touching her breast on one occasion not severe or pervasive).

Therefore, even if Plaintiff had a subjective belief Smith's conduct was sexual harassment, that belief was not objectively reasonable.  Accordingly, the Court concludes that there are no genuine issues of material fact as to whether Plaintiff engaged in protective activity for Title VII retaliation purposes, and thus Plaintiff cannot establish a *prima facie* case of retaliation.

### b.    *Causal connection*

Defendant alternatively argues that Plaintiff cannot show that his dismissal was causally connected to any alleged protected activity.  The Court disagrees.

36

In order to establish a causal connection, Plaintiff need only show that "the protected activity and the adverse action were not wholly unrelated." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (quoting *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1337 (11th Cir. 1999)). The Supreme Court has stated that where mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action has been held to be sufficient evidence of causality to establish a *prima facie* case, the temporal proximity must be "'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). In this case, Defendant terminated Plaintiff approximately one week after his interview with Kirkpatrick. Standing alone, this close proximity would be sufficient to satisfy the causal connection prong. *See Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 702 (11th Cir. 1998) (five weeks sufficient); *Farley,* 197 F.3d at 1337 (seven weeks sufficient).

Defendant argues, however, that where "an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006)*; Cotton v. Cracker Barrel Old Country Store, Inc.,* 434 F.3d 1227, 1232

AO 72A
(Rev.8/8
2)

(11th Cir. 2006) (no causal connection when supervisor informed employee that work hours would be reduced prior to complaint). Defendant asserts that it had contemplated disciplinary action prior to Plaintiff' interview with Kirkpatrick.  Defendant points out that Hester had already questioned Plaintiff about Smith's allegations concerning the manual and "put Plaintiff on notice that he would have to explain his conduct in a written statement to be submitted by the following work day," (Def. Br. at 10), and that Plaintiff's FTO status had recently been revoked due to misconduct.

*Drago* and *Cotton* are distinguishable.  In *Drago*, the supervisor had considered demoting plaintiff prior to the protected activity.  *Drago*, 453 F.3d at 1308.  In *Cotton*, the supervisor had informed the plaintiff prior to the protected activity that her work hours would decrease.  Both plaintiffs eventually suffered the same adverse action that they had been warned might occur prior to engaging in protected activity.

The record here does not indicate that defendant contemplated any specific adverse action against Plaintiff prior to his interview with Kirkpatrick.  In regard to the manual incident, Hester merely requested Plaintiff submit in writing his version of events.  In the letter informing Plaintiff of the loss of his FTO status, Brooks stated, "I can't stress to you enough the need for you to make an immediate (positive) change in your behavior."  (Millsaps Aff., Exh. I).

38

The Court concludes that, if Plaintiff had engaged in statutorily protected activity (or a material fact question remained as to whether he had so engaged), Defendant's threat of unspecified disciplinary action in response to a various incidents of misconduct would not have been sufficient to defeat the causal connection element of Plaintiff's *prima facie* case.

However, because Plaintiff cannot establish that he engaged in statutorily protected activity, the hypothetical existence of a causal connection is immaterial and does not alter this Court's conclusion that Defendant is entitled to summary judgment on Plaintiff's Title VII retaliation claim.

> 2. *Defendant's Legitimate Nondiscriminatory Reason and Plaintiff's Evidence of Pretext*

Although a court's analysis generally ends with a finding that the plaintiff failed to establish a *prima facie* case, *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984), the Court nevertheless will address the remaining steps in the *McDonnell Douglas* analysis to show that summary judgment would be appropriate even if Plaintiff had established a *prima facie* case of Title VII retaliation.

Defendant contends that it had legitimate non-discriminatory reasons to discharge Plaintiff. It contends that Plaintiff's dismissal was a culmination of a long

39

history of absenteeism and misconduct.  It asserts that Plaintiff was terminated because he failed to exhibit teamwork and organizational commitment, failed to comply with departmental policies and procedures, maintain civil and courteous relationships with co-workers and supervisors, as well as engaged in inappropriate use of leave and situations in which he may have had a conflict of interest. [Doc. 13 at 13-15].

In order to meet its burden in this stage of the *McDonnell Douglas* paradigm, Defendant need only produce evidence that could allow a rational fact finder to conclude that its discharge was not made for a discriminatory reason.  This is a burden of production, not persuasion.  *Standard v. A.B.E.L. Svcs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). These reasons satisfy Defendant's burden of production on this issue.  *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994) ("The employer need only offer admissible evidence sufficient to raise a genuine issue of fact as to whether it had a legitimate reason for [discharging] the plaintiff.")

Once the defendant has carried its burden of showing a legitimate nondiscriminatory reason for its actions, a plaintiff must "be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reason[] offered by the defendant [was] not its true reason[], but [was a] pretext for discrimination.'" *Reeves*

40

*v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253).  A plaintiff may establish pretext "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256 (citing *McDonnell Douglas*, 411 U.S. at 804-05). A plaintiff's burden of demonstrating pretext "merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Burdine*, *id.*

Plaintiff relies solely on temporal proximity of his termination to demonstrate pretext.  He argues that "[i]n light of the unusual proximity between the sexual harassment complaint made by Ms. Taylor and the sudden termination of both Ms. Taylor and the Plaintiff from their employment, it cannot be denied that there is sufficient doubt cast upon the proffered legitimate nondiscriminatory reason give by Defendant for the dismissal of Plaintiff."  (Pl. Br. at 8).

In order to show pretext:

. . . the plaintiff is not required to introduce evidence beyond that already offered to establish the *prima facie* case . . .  Evidence already introduced to establish the *prima facie* case may be considered, and "[i]ndeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation" and establish pretext.

41

*Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920-21 (11th Cir. 1993) (quoting *Burdine*, 450 U.S. at 250 n.10 (1981) (internal citations omitted).

This is not one of those cases, however.  Initially, the Court notes that Plaintiff has not established a *prima facie* case of retaliation.  Moreover, according to the docket, Plaintiff apparently elected not to depose any of Defendant's employees to attempt "to discredit the defendant's explanation."  *Id.  See Dkt. generally*.  Nor has he otherwise identified inconsistencies in Defendant's statements or shown that similarly situated employees were treated more favorably.  *See Howard v. B.P. Oil*, 32 F.3d 520, 526 (11th Cir. 1994) ("identification of inconsistencies in the defendant's testimony is evidence of pretext).  In light of the fact that Plaintiff cannot demonstrate that he engaged in protected activity, temporal proximity between Taylor's sexual harassment complaint and Plaintiff's termination is insufficient to defeat Defendant's motion for summary judgment.

Even if Plaintiff had established a *prima facie* case, however, his argument  that considering his prior disciplinary problems, "the question certainly arises as to why the Defendant did not terminate the Plaintiff prior to October 7, 2005," (Pl. Br. at 7), is unavailing.  Plaintiff had been warned on June 29, 2005, that he needed to "make an immediate (positive) change in [his] behavior" after an incident in which Defendant

42

determined that he had attempted to undermine Smith's authority as a supervisor and caused dissension within his division.  (Millsaps Aff. Exh. I).  Yet approximately three months later, he was involved in another incident with Smith.  This last offense likely was the "straw that broke the camel's back.'" *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1313 (11th Cir. 1998) (quoting *Rohde v. K.O. Steel Castings, Inc.*, 649 F.2d 317, 322 (5th Cir. 1981)) (*superseded in part by* 151 F.3d 1321 (11th Cir. 1998)); *Henry v. City of Tallahassee*, 216 F. Supp. 2d 1299, 1317 (N.D. Fla. 2002) (multiple instances of misconduct "straw that broke the camel's back") (quoting *Jones*).

The undersigned notes that Plaintiff has not argued that Defendant did not have a good-faith belief that Plaintiff engaged in the alleged misconduct.  *See Hawkins v. Ceco Corp.,* 883 F.2d 977, 980 n.2 (11th Cir. 1989) (that the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong.).  Plaintiff does not dispute that he was absent from work, and even admits that he engaged in gossip about Smith. (Pl. Dep. at 122-23).  The undersigned also observes that Casteel, Monroe and Hester's statements all support Smith's version of events regarding the manual.

"[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir.

43

2000) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). "[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not [discriminatorily] motivated." *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2000). Accordingly, the Court will not second-guess Defendant's decision to terminate Plaintiff after repeated incidents of misconduct, in particular misconduct involving the same individual, Smith.

In light of the fact that Plaintiff has failed to rebut Defendant's legitimate nondiscriminatory reasons for his termination, the Court finds that Plaintiff has not demonstrated that Defendant's reasons are pretextual. Summary judgment is, therefore, appropriate as to Plaintiff's Title VII retaliation claim on these grounds as well.

> B.   *Plaintiff's State Law Claim for "Negligent Infliction of Emotional Distress."*

Defendant has not moved for summary judgment on Plaintiff's state law claim for negligent infliction of emotional distress. Generally, however, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction" and dismiss the state claims as well. 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S.

44

343, 350 (1988); *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966); *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11ᵗʰ Cir. 1997).

Accordingly, Plaintiff's state law claim for "negligent infliction of emotional distress" is **DISMISSED WITHOUT PREJUDICE**.

**VI.    CONCLUSION**

For the above and foregoing reasons, Defendant's Motion for Summary Judgment, [Doc. 13], is **GRANTED** and Plaintiff's Title VII retaliation claim is **DISMISSED WITH PREJUDICE**.  Pursuant to 28 U.S.C. § 1367(c), Plaintiff's state law claim for "negligent infliction of emotional distress" is **DISMISSED WITHOUT PREJUDICE**.

The Clerk is **DIRECTED** to enter judgment for Defendant.

**IT IS SO ORDERED and DIRECTED**, this the 11ᵗʰ day of December, 2007.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

45